PAULINE E. HAWN, Plaintiff-Appellant, v. JULIA K. FRITCHER, Defendant-Appellee.

Fourth District   No. 4—98—0143

Opinion filed November 4, 1998.—Rehearing denied December 15, 1998.

McCULLOUGH, J., dissenting.

Raymond R. Kimpel, of Champaign, for appellant.

Karen L. Kendall and Brad A. Elward, both of Heyl, Royster, Voelker &

Allen, of Peoria, and Fred K. Heinrich, of Heyl, Royster, Voelker & Allen, of Urbana, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In March 1995, plaintiff, Pauline E. Hawn, sued defendant, Julia K. Fritcher, for personal injuries resulting from an automobile collision in 1993. After the trial court made several preliminary rulings, a jury trial was held in October 1997 solely on the issue of damages, and the jury awarded Hawn $40,000. Hawn appeals, arguing only that the court erred by striking portions of her physician's testimony. The court ruled that the testimony was not sufficiently certain and conclusive to be admissible regarding the cause of Hawn's injuries. We reverse and remand.

## I. BACKGROUND

In March 1993, Fritcher failed to yield at a rural intersection and collided with Hawn's vehicle. Hawn incurred several injuries, including a cut and some tenderness on her left knee.

In March 1995, Hawn filed this suit. In February 1997, the trial court granted Hawn's motion for partial summary judgment on the issue of liability.

Shortly before trial on the issue of damages, the trial court granted Fritcher's motion to strike portions of the evidence deposition of Hawn's orthopedic surgeon, Dr. Gaylin Lack. In that deposition, Lack testified regarding a knee condition Hawn developed in 1994 that eventually required surgery in 1996.

Although Lack did not provide any specific treatment for the injury to Hawn's knee that occurred in the 1993 collision with Fritcher's vehicle, he did place her on crutches because her left hip also had been fractured in the collision. He also monitored Hawn's left knee during follow-up visits. A May 1993 magnetic resonance image (MRI) showed no structural abnormalities, and when Lack examined Hawn later that month, he noted that her knee "tenderness was better."

In September 1994, Hawn contacted Lack's office after hurting her back at work. During her subsequent visit, she complained that her left knee was once again tender. Lack diagnosed the knee condition as chondromalacia, a degenerative condition where the cartilage on the back surface of the kneecap becomes soft and rough, causing pain in the front of the knee.

In May 1995, Hawn first complained of pain in her right knee, and by November 1995, both knees had degenerated to the point where she had difficulty standing up out of a chair. Lack then prescribed work restrictions and physical therapy.

Hawn's knees improved until February 1996, when she returned

to work. Then they became worse until, in April 1996, Lack recommended arthroscopic surgery to correct her chondromalacia.

Lack performed the surgery on Hawn's knees in April and June 1996. During the surgeries, he viewed the cartilage behind Hawn's kneecaps and confirmed that she had chondromalacia in both knees.

Both parties questioned Lack about the cause of Hawn's chondromalacia. During direct examination, Lack testified as follows:

"A. [Dr. Lack:] *** Its, its causes are varied. May arise de[ ]novo, without any specific known cause, may[ ]be as a result of an injury or trauma which most often, if it's related to trauma, it's due to a direct blow to the front of the knee, or the mechanism of pushing the knee cap back into the femoral condyles [(the end of the thigh bone)].

Q. [Hawn's attorney:] Do you have an opinion, Doctor, based upon a reasonable degree of medical and orthopedic surgery, whether the chondromalacia you've described might or could have been caused by the auto accident in which Hawn was involved?

* * *

A. The condition of chondromalacia could be caused by, by the mechanism of the auto accident in which the patella, or knee, would be contused [(bruised)], or a blow to the knee would be sustained.

Q. So is your opinion, as to whether it might or could have been caused by the auto accident, is your answer yes or no?
***
A. Yes, it could."

Later, the following exchange took place:

"Q. [Hawn's attorney:] Now, Doctor, based upon a reasonable degree of medical and surgical certainty, do you have an opinion as to whether or not the conditions in Hawn's knees that required the arthroscopic surgery might or could have been the result of the auto accident in which she was involved?
***
A. I think that the—I think that the left knee might or could have been.

Q. And is it your opinion that the right knee might have been the result of an overload from favoring the left knee?
***
A. I think that that could, could have been a contributing factor."

However, Lack also testified that in September 1995, he suspected that Hawn's symptoms were "probably primarily the result of her occupation or her job requirement at that time, which was basically standing on her feet for 10 to 12 hours a day on concrete surfaces."

On cross-examination, the following exchange took place:

"Q. [Fritcher's attorney:] Doctor, you can't say that the right

knee problems that [Hawn] had about two and a half years after the accident were more probably true than not caused by the car accident on March 8, 1993; isn't that correct?

A. That's correct.

* * *

Q. So is it fair to say that just like the right knee you can't say that it's more probably true than not that the problems in her left knee were caused by the car accident two and a half years before?

A. That's correct."

In addition, Lack testified as follows:

"Q. [Fritcher's attorney:] [Hawn's attorney] asked you some questions about overcompensation on the right side. You don't have any evidence that Pauline Hawn was overcompensating on the right side; do you?

A. I think if there was overcompensation, it's likely that it would have been in the time of her initial injury incident.

Q. In other words,—

A. In other words, when she was being treated for the hip problem, and the initial problems and that, that's likely when—if there is overcompensation occurring—that that's when that would have happened.

* * *

Q. At this time, however, you have no evidence that Pauline Hawn was in fact overcompensating on the right side because of the left hip injury; isn't that correct?

A. Correct.

Q. So any opinion you would have on overcompensation would be purely speculative; isn't that true?

A. That's correct."

Fritcher's attorney also elicited the following testimony:

"Q. [Fritcher's attorney:] And, in fact, it's more likely than not that the problems Hawn had with her right knee were caused by her work activities, those being working 12 hours a day standing on concrete; is that correct?

A. That's correct.

* * *

Q. And, in fact, the left knee problems that she was having in 1994, 1995 and 1996, would it be fair to say that it's more probably true than not that those were caused by her work activities?

A. That would be fair to say."

The trial court granted Fritcher's motion to strike all of the deposition testimony relating to the condition of Hawn's knees during 1994 through 1996. In so ruling, the court concluded that "[i]t ap-

pears in those quotes from Dr. Lack that Dr. Lack *more probably than* *not* would attribute the knee problems to work[-]related injuries as opposed to the accident. And *that is the test that the jury must subject the evidence to*." (Emphasis added.)

The jury awarded Hawn $40,000 in damages, and she appeals.

## II. ANALYSIS

Hawn argues that Lack's causation testimony under direct examination laid sufficient foundation for the jury to hear his testimony relating to the condition of her knees. In response, Fritcher argues that Lack's testimony on cross-examination sufficiently impaired the strength of his direct testimony so as to render it immaterial and irrelevant. Specifically, Fritcher contends that Lack's testimony was required to meet Hawn's burden of proof on the issue of causation. We agree with Hawn.

### A. The Opinion Witness' Direct Testimony Regarding Causation

■ Although opinion witnesses may not base their testimony on conjecture or speculation (*Conners v. Poticha*, 293 Ill. App. 3d 944, 950, 689 N.E.2d 313, 318 (1997)), they may testify in terms of what "might or could" have caused the plaintiff's injury (*Clifford-Jacobs Forging Co. v. Industrial Comm'n*, 19 Ill. 2d 236, 243-44, 166 N.E.2d 582, 587 (1960); *Conners*, 293 Ill. App. 3d at 950, 689 N.E.2d at 318; *Wingo v. Rockford Memorial Hospital*, 292 Ill. App. 3d 896, 909, 686 N.E.2d 722, 731 (1997); *McKenzie v. SK Hand Tool Corp.*, 272 Ill. App. 3d 1, 8-9, 650 N.E.2d 612, 617 (1995); *Mesick v. Johnson*, 141 Ill. App. 3d 195, 205-06, 490 N.E.2d 20, 28 (1986)). In fact, at one time such language was required for the witness to avoid invading the province of the jury. See generally *Clifford-Jacobs*, 19 Ill. 2d at 241-42, 166 N.E.2d at 585-86 (providing a historical discussion).

Under the modern rule, an opinion witness may testify that an accident "did" cause the plaintiff's injury, but the witness may also use the traditional "might or could" language. In such cases, the opposing party may point out weaknesses in the witness' testimony, and the jury can then decide what weight, if any, to give to the witness' opinion. *McKenzie*, 272 Ill. App. 3d at 8-9, 650 N.E.2d at 617-18; *Mesick*, 141 Ill. App. 3d at 206, 490 N.E.2d at 28.

■ Here, Lack testified that, to a reasonable degree of medical certainty, the accident "might or could" have caused the condition of Hawn's knees in 1994, 1995, and 1996. Similarly, he testified that her surgery in 1996 "might or could" have been necessitated by the accident. This testimony established a sufficient foundation for the jury to hear his testimony relating to the condition of Hawn's knees.

## B. The Cross-Examination of the Opinion Witness

Nonetheless, Fritcher argues that Lack's testimony on cross-examination sufficiently impaired the strength of his direct testimony so as to render it immaterial and irrelevant. She points out that a plaintiff must prove that a defendant's negligence, more probably than not, caused the plaintiff's injury. Based upon that "black letter law," Fritcher then claims that a witness' opinion must similarly meet this "more probable than not" standard to be admissible. Thus, Fritcher asserts that her cross-examination of Lack established that his opinion failed to meet this standard. We disagree.

■ As the Second District Appellate Court recently noted, the law does not require that "every question posed to an expert in a negligence case must be asked in terms of 'more probably true than not true.' " *Wingo*, 292 Ill. App. 3d at 909, 686 N.E.2d at 731. Similarly, not every piece of a party's evidence must individually meet that party's burden of proof. Instead, the threshold test for the admissibility of any particular piece of evidence is whether it is relevant. A treatise on evidence law explains this distinction as follows:

> "An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. *It need not ever make that proposition appear more probable than not.* Whether the entire body of one party's evidence is sufficient to go to the jury is one question. Whether a particular item of evidence is relevant to his case is quite another. It is enough if the item could reasonably show that a *fact* is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable. Thus, the common objection that the inference for which the fact is offered 'does not necessarily follow' is untenable. It poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall.
> ∗∗∗
> ∗∗∗ [D]irect evidence from a qualified witness offered to help establish a provable [and material] fact can never be irrelevant." (Emphasis added.) J. Strong, McCormick on Evidence § 185, at 776, 777 (4th ed. 1992).

■ Even though Hawn must ultimately establish that Fritcher's negligence more likely than not caused her injuries, her burden for demonstrating the relevance of individual pieces of evidence is significantly lower. For evidence to be relevant, it need only tend to make the existence of any fact of consequence more probable or less probable than it would otherwise be. *People v. Johnson*, 114 Ill. 2d 170, 193, 499 N.E.2d 1355, 1365 (1986); *Spencer v. Wandolowski*, 264 Ill. App. 3d 611, 617, 636 N.E.2d 854, 858 (1994); *Yamnitz v. William*

*J. Diestelhorst Co.*, 251 Ill. App. 3d 244, 250, 621 N.E.2d 1046, 1050 (1993). It follows that evidence may be admissible even when it fails to meet the plaintiff's burden of proof.

Judge Learned Hand explained this point in the context of criminal prosecutions as follows:

"[M]ost convictions result from the cumulation of bits of proof which, taken singly, would not be enough in the mind of a fair minded person. All that is necessary, and *all that is possible*, is that each bit may have enough rational connection with the issue to be considered a factor contributing to an answer." (Emphasis added.) *United States v. Pugliese*, 153 F.2d 497, 500 (2d Cir. 1945).

The same analysis applies in a civil case. If the rule were otherwise— that is, if each piece of the plaintiff's evidence were required individually to meet his or her burden of proof—then most of the evidence in most civil cases would never reach the jury.

Furthermore, Fritcher's proposed analysis contradicts the approach used in *Mesick*, 141 Ill. App. 3d 195, 490 N.E.2d 20. In that case, the plaintiff began suffering from a nasal condition a few months after her injury in an automobile accident. On cross-examination, her doctor opined that "there is no way I can state objectively as to the cause [of the plaintiff's nasal condition]." *Mesick*, 141 Ill. App. 3d at 206, 490 N.E.2d at 28. The appellate court noted that the defense counsel's cross-examination failed to completely negate the doctor's original testimony on causation, during which he testified that the condition was "consistent" with the accident that the plaintiff described. Thus, the cross-examination did not destroy the evidence's admissibility. *Mesick*, 141 Ill. App. 3d at 202, 205-06, 490 N.E.2d at 26, 28.

■ Like the physician in *Mesick*, Lack testified on cross-examination that his opinion was not conclusive. However, he did not withdraw his direct testimony that the accident "might or could have" caused the chondromalacia about which he testified. Thus, the cross-examination failed to render Lack's testimony inadmissible. Lack's earlier "might or could have" testimony, even after cross-examination, met the foundation necessary to be admissible. Accordingly, we hold that the trial court erred when it ruled Lack's opinion testimony inadmissible because it did not meet the standard of certainty that applies to a plaintiff's *overall* burden of proof.

We further conclude that the trial court's error was reversible. The trial was held solely for the purpose of determining Hawn's damages. Unquestionably, the condition of her knees resulted in significant pain, and it was the only claimed injury on which Hawn had medical testimony establishing a long-term effect from the accident.

The court's striking of portions of Lack's deposition entirely removed from the jury's consideration an important component of Hawn's claim for damages. We note that this component included the medical expenses resulting from Lack's treatment of Hawn's knees. We conclude that this evidentiary ruling substantially prejudiced Hawn's ability to prove damages, thus entitling her to a new trial on that issue.

## III. CONCLUSION

We reverse the trial court's judgment and remand for further proceedings consistent with the views expressed herein.

Reversed and remanded.

COOK, J., concurs.

JUSTICE McCULLOUGH, dissenting:

The trial court's ruling as to the evidence deposition testimony of Dr. Lack did not constitute an abuse of discretion. Dr. Lack, being questioned by plaintiff's attorney, testified his first examination found "painful motion of her left hip," "pain with motion or palpation over the right wrist and distal forearm," "forehead lacerations and other superficial lacerations and cuts at various places." He then reviewed his treatment with respect to forehead lacerations, the right arm fracture and the hip, pelvic fracture. When she was discharged from the hospital, the only restrictions mentioned were that she be on crutches. On March 31, 1993, X rays were taken of the hip and wrist. On April 21, 1993, the plaintiff was seen again, the cast was removed from the right arm and again X rays were taken of the left hip and right arm, showing no displacement of the hip and evidence of healing.

Any complaint as to the knees was first made at an appointment on May 19, 1993. Dr. Lack said there was no record to document any prior complaint as to the knees and he did not recall any laceration on the left knee. An MRI performed May 21, 1993, "had not demonstrated any significant abnormality on the left knee." At a subsequent appointment on October 11, 1993, Dr. Lack's testimony concerned only the left hip and an X ray and MRI with respect to the left hip.

The testimony of Dr. Lack shows the first concern for the knees was at an appointment September 29, 1994, more than 18 months after the accident of March 8, 1993.

As the majority states, the knee condition was diagnosed as chondromalacia, a degenerative condition of the knee. A review of the

direct examination and the cross-examination, including that testimony set forth by the majority, makes it clear the trial court did not commit an abuse of discretion in its ruling.

Although as trial judge I would have overruled the defendant's objection, on review I would affirm the trial court.