BONG JIN KIM *et al.,* Parents and Next Friends of Linda Sung Hee Kim, Plaintiffs-Appellants, v. G. NAZARIAN *et al.,* Defendants-Appellees.

Second District   No. 2—90—1005

Opinion filed July 19, 1991.

Dan Karlin, Ltd., Dan Brusslan, of Fischel & Kahn, Ltd., and Linda A. Bryceland, of David A. Novoselsky & Associates, all of Chicago (David A. Novoselsky, of counsel), for appellants.

Steven L. Larson, of Wildman, Harrold, Allen & Dixon, of Waukegan (Daniel P. Felix, of counsel), for appellees.

PRESIDING JUSTICE REINHARD delivered the opinion of the court:

Plaintiffs, Bong Jin Kim and Young Sil Kim, parents and next friends of Linda Sung Hee Kim (Linda), brought the instant medical malpractice action in the circuit court of Lake County to recover from defendants, Gordon R. Nazarian, M.D., and Lake County Radiology Associates, S.C. (Lake County Radiology), for their failure to diagnose Linda's illness. Following trial, the jury returned a verdict in favor of defendants, and plaintiffs now appeal.

At issue on appeal is whether the trial court committed reversible error in allowing defendants' expert witnesses, in the process of giving their own expert opinions, to testify regarding the corroborative opinions of nontestifying experts with whom they consulted.

In April 1982, Linda, then a 13-year-old student at Hawthorne Junior High School, experienced pain in her right hip while engaged in gymnastics at school. A few days later, Linda was examined by her family physician, Dr. Pu Woong Kim (no relation), who recommended that Linda not engage in gymnastics for a while and wrote her a prescription for an X ray. The X ray was taken on May 8, 1982, at Condell Memorial Hospital (Condell) under the direction of Lake County Radiology. Defendant Gordon R. Nazarian, M.D., a radiologist and an independent contractor employed by Lake County Radiology, examined the X ray and determined that it was normal.

During the summer of 1982, Linda stopped exercising, and the pain in her hip "got better." When she started riding a bicycle, however, the pain returned. It subsided when she stopped riding, so Linda thought the pain was the result of exercising or using her hip too much. In the fall of 1982, Linda's hip was stiff and inflexible, and she experienced throbbing pain at times.

Subsequently, in February 1983, Mr. Kim noticed that Linda walked with a slight limp. In April 1983 Linda was examined by Dr. James R. Creath, an orthopedic surgeon. Dr. Creath directed Linda to have another X ray taken. After concluding that the X ray revealed an abnormality, Dr. Creath referred Linda to Dr. Mihran D. Tachdjian, a licensed and board-certified pediatric orthopedic surgeon. Dr. Tachdjian had served as a professor of orthopedic surgery at Northwestern Medical School and had published a textbook on pediatric orthopedics.

Dr. Tachdjian first saw Linda on April 20, 1983, and he recommended that Linda be hospitalized in order to examine her. CAT scans revealed signs consistent with a diagnosis of tuberculosis of the hip bone. Dr. Tachdjian performed surgery to confirm this diagnosis. A

pathologist's test of the tissue removed during surgery confirmed that Linda had tuberculosis of the hip. On July 5, 1983, he performed a second surgical operation on Linda's hip to clean the joint of infected tissue.

In 1985, plaintiffs filed a 12-count complaint in the circuit court of Cook County against Dr. Kim, Condell, Dr. Nazarian, and Lake County Radiology alleging various acts of negligence in failing to detect Linda's condition earlier. That action was transferred to the circuit court of Lake County on October 23, 1985. A second amended complaint was filed November 18, 1986. After plaintiffs' complaint was dismissed without prejudice as to Dr. Nazarian for failure to exercise due diligence in serving him (134 Ill. 2d R. 103(b)), plaintiffs filed a new complaint against Nazarian pursuant to section 13—217 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1989, ch. 110, par. 13—217). The circuit court granted plaintiffs' motion to consolidate the existing case with the newly filed action against Dr. Nazarian. Dr. Kim's motion for summary judgment on those counts of plaintiffs' complaint directed against him was granted on October 11, 1988, and is not an issue in this appeal.

Plaintiffs' six-count, third amended complaint was filed March 16, 1990, and named Condell, Lake County Radiology, and Dr. Nazarian as defendants. All six counts were based on defendants' alleged negligence in failing to diagnose the abnormality in Linda's X ray, and each of the three defendants was the subject of one count seeking recovery for Linda's injuries and one count pursuant to the statutory provision regarding family expenses (Ill. Rev. Stat. 1989, ch. 40, par. 1015) to recover payments made by Linda's parents for her medical expenses.

Defendants' answers to the complaint denied that they were negligent in reading Linda's X ray. Defendants also put forth as an affirmative defense plaintiffs' comparative fault in failing to bring Linda to the doctor in light of her continuing pain. The court subsequently dismissed Condell from the action pursuant to plaintiffs' motion. This ruling has not been appealed.

Prior to trial, plaintiffs filed a motion *in limine* seeking, *inter alia,* to have the trial court prevent defendants' experts from testifying to the opinions of other nontestifying doctors with whom they may have consulted regarding Linda's X rays. The trial court denied this motion *in limine.*

The cause proceeded to trial on April 10, 1990. During his opening statement, defendants' attorney made the following remarks in regard to the anticipated testimony of defendants' expert witnesses:

"MR. FELIX: *** Dr. Richard Buenger—he just stepped down as Chairman of the Radiology Department down in St. Luke's Hospital, down in Chicago. He is also a general radiologist, and he will also tell you in his work what he does is consult with other doctors on the staff, other radiologists, to make sure his opinion is correct. And he did that. He reviewed this with several radiologists on his staff, including a specialist in child radiology pictures. And they all agreed it was normal.

MR. BRUSSLAN [plaintiffs' attorney]: Your honor, I would like to make an objection at this time with regard to the point of the consulting radiologist.

THE COURT: Your objection is noted. Continue, please.

MR. FELIX: Thank you, your Honor.

The other doctor who saw the X-rays in the same context as Dr. Nazarian is a fellow by the name of Dr. Mandel Schwartz. He is the Chief Radiologist over here at Victory Hospital. He will tell you he looked at these X-rays. *** He said those X-rays are absolutely normal. And you will hear him say that. And he also consulted with his partner in the course of developing and confirming his opinion of these X-rays. The partner agreed they were normal."

Plaintiffs' case began with the testimony of Mr. Kim, who stated that Linda never complained of pain in her hip after the consultation with Dr. Kim. Mr. Kim stated that Dr. Kim never told him to bring Linda in again if the pain persisted.

Plaintiffs called Dr. Nazarian as an adverse witness pursuant to section 2—1102 of the Code (Ill. Rev. Stat. 1989, ch. 110, par. 2—1102). Dr. Nazarian testified that the three X rays taken of plaintiff on May 8, 1982, which he again viewed in the courtroom, were "normal." Dr. Nazarian stated that certain darkened areas in the X rays, or "radiolucency," were the result of "technique" and would not indicate an abnormal finding. Dr. Nazarian explained that these differences can occur because of different levels of X-ray penetration through bones of varying thickness.

Plaintiffs then presented the videotaped testimony of Dr. Tachdjian. After recounting his diagnosis and treatment of Linda's tuberculosis, Dr. Tachdjian testified that, although the tuberculosis process had healed, Linda had residual arthritis of the hip. Dr. Tachdjian testified that the 1982 X rays of Linda's hip revealed an abnormality in the form of bone destruction or erosion in the neck of the femur. In Dr. Tachdjian's opinion, Dr. Nazarian deviated from the standard of care for radiologists in Lake County when he determined the X rays

were normal. Dr. Tachdjian further opined that Dr. Nazarian's breach of the standard of care caused a delay in diagnosis and allowed for further destruction of the hip which, in turn, required more extensive surgery and increased the likelihood of Linda developing arthritis. On cross-examination, Dr. Tachdjian admitted that, in his prior deposition, he stated that he did not know if the delay in Linda's treatment was caused by the improper diagnosis or by Mr. Kim's failure to listen to his daughter's complaints. Dr. Tachdjian also admitted that he is not board certified in radiology.

Dr. Jack Melamed, a physician specializing in radiology, testified for plaintiffs that he had viewed the 1982 X rays of Linda's hip and determined that they "revealed an abnormal region." Dr. Melamed testified that Dr. Nazarian deviated from the standard of care for radiologists in Lake County in reading the X rays as normal.

Linda testified regarding her injury and the events leading up to the detection of her tuberculosis. Plaintiffs then rested.

Defendants called as a witness Dr. Edward May, a physician specializing in radiology and the president of Lake County Radiology. It was only after the instant litigation had commenced that Dr. May viewed the X rays taken of Linda in 1982. Dr. May concluded the X rays were negative.

Dr. Kim, plaintiffs' family physician, testified for defendants, but he gave unclear testimony as to whether he instructed plaintiffs to report back to him if Linda's pain persisted.

Defendants called as a witness Dr. Thomas H. Brendel, a physician specializing in radiology and vice-president of Lake County Radiology. Dr. Brendel, who first viewed Linda's 1982 X rays after the initiation of the instant action, testified that the X rays "were within normal limits" and that darkened areas on the X rays were due to technique and varying bone density.

Dr. Mandel Schwartz, a radiologist and radiology director at St. Therese Hospital in Waukegan, testified for defendants that, in his opinion, the 1982 X rays of Linda's hip were normal. Defense counsel then asked the following question:

"Q. In formulating your opinion, did you consult with any other radiologists in your department?

MR. BRUSSLAN [plaintiffs' attorney]: I object, your Honor.

THE COURT: Your objection is noted. Overruled.

THE WITNESS: A. I passed the radiologies around to at least one of my partners, as I recall."

\* \* \*

Q. And what were you told by that radiologist as to what his interpretation was?

A. He thought it was normal."

Dr. Schwartz testified that Dr. Nazarian did not deviate from the standard of care in finding the X rays to be normal.

On cross-examination, Dr. Schwartz testified that he concluded the X rays were normal on the day he was first shown them by defendants' attorney. The following was asked on redirect examination:

"Q. Doctor, just following up on one thing. Is it customary for you to consult with other radiologists on your staff before coming up with a final interpretation?

A. Oh, no. I usually come up with—I come up with a verification first. I always have my own opinion. But we frequently pass around films, you know, or have meetings. I had formed my opinion on this case when I first looked at the X-rays.

Q. Okay. Once you did that, why did you make a consultation?

A. Well, because I was advised by the attorney that this was a legal case and if something turned up on the hip. So I just passed it around to see if somebody else saw something that I didn't. But I had my opinion already. \*\*\*

Q. \*\*\* If, supposing one of the radiologists you consulted with suggested that he or she did see some type of abnormality, would you consider that in your opinion?

A. Yes.

\* \* \*

Q. After you came up with your first opinion, in the interpretation of these films, then passed it around and discussed it with other radiologists in your department, what did you do \*\*\*?

\* \* \*

A. I didn't form any other opinion.

\* \* \*

Q. Could you explain to us why you didn't change your opinion after you consulted with the other radiologists in your department?

MR. BRUSSLAN: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: A. The other radiologists felt that the films were normal."

Plaintiffs' attorney renewed his objection to this line of testimony, but the objection was again overruled. On re-cross-examination, plaintiffs' attorney asked the following:

"Q. If one of the radiologists had made some suggestions to you and said, 'Hey, I think that maybe those two darkened areas should be explored further, and I don't know if you can read that as normal,' would you have changed your mind?

A. I might have."

Dr. Creath testified for defendants that, when he reviewed Linda's 1982 X rays shortly after she consulted with him in April 1983, he determined that they were normal. He did, however, find abnormality in the additional X rays he had taken at that time.

Dr. Richard E. Buenger, chairman emeritus of the department of radiology and nuclear medicine at the Rush-Presbyterian-St. Luke's Medical Center in Chicago, testified for defendants that, when he first viewed Linda's 1982 X rays, he concluded that they were completely normal. After being told that Linda was diagnosed with tuberculosis of the hip, his opinion did not change, and he could not detect early signs of tuberculosis in the X rays. Defense counsel then posed the following question:

"Q. In finalizing your opinion, did you consult with various other radiologists in your department?

A. Yes, which is my usual case. I take the films to other members of my department. In this case, I took them to a bone radiologist and I took them to a pediatric radiologist, both of whom were instructing residents an [sic] the time, and I put the films up and asked them to look at them and asked them if they could see anything wrong with the films, and neither one was able to see anything wrong with the films, at which time I asked them if this turned out to be a case of tuberculosis, where do you think it would be, and they said we don't know, because we can't see anything wrong with the films.

Q. And in your work generally, outside as a consultant in legal cases, is it your custom to occasionally, or frequently, consult with other radiologists in your department in formulating your opinions?

A. We all do this every day. That is one of the benefits of a large department. When there is a problem case or there is [sic] symptoms where the answer isn't found, we ask others to come look at the films, and we take our films to others so we can get a consensus.

Q. *** [I]f in consulting with other radiologists in the department, you find disagreement, does that get factored into your interpretation?

A. Yes. In fact, the report will often state there is a difference of opinion in the interpreters. So the referring physician knows it. ***

Q. And did any of the doctors you consulted indicated [sic] there was any abnormality on these films?

A. None of them saw any abnormality."

Dr. Buenger testified that, in his opinion, Dr. Nazarian did not depart from the standard of care in his reading of Linda's 1982 X rays.

On cross-examination, plaintiffs' attorney explored Dr. Buenger's consultations with other doctors:

"Q. *** You consulted with other radiologists before you rendered that first opinion?

A. No, sir. I rendered my opinion after looking at them myself. I told [defense counsel] my opinion. Then we went to see other people.

Q. Okay. So I think I understand. You rendered your opinion without consulting any other of your colleagues?

A. Yes. And then I went to check my opinion the same day, the same time.

Q. When you say you went to check your opinion, you talked to a group of radiologists in your hospital, or your group?

A. Yes, sir.

Q. How many did you talk to?

A. I only said two or three because I only remember two by names specifically.

* * *

Q. Okay. And if, Doctor, one or two of them would have said that they feel these films show an abnormality, would you you [sic] have changed your opinion?

A. I would have told [defense counsel] there is a difference of opinion.

Q. But would you have changed your personal opinion?

A. I'm agreeable to change if they can point out something to me that I missed or not understood, yes, I could be subject to change."

Defendants then rested.

Before closing arguments, defendants withdrew their comparative negligence defense. During closing argument, defendants' attorney

commented on the number of expert witnesses testifying for each side:

> "[I]f you take that common sense fact that you have two against six, you have to come back to the burden of proof and say, did they prove it, did they prove to you, did they convince you that it is more likely true than not true that these X-rays were abnormal.
>
> Ladies and gentlemen, the only way that you can give a verdict for the plaintiffs is if you say that all the people, all six of those doctors are either grossly incompetent or came up and lied to you."

The jury returned a verdict in favor of defendants, and the trial court entered judgment accordingly.

Plaintiffs subsequently filed a post-trial motion to set aside the verdict on the ground that two of defendants' experts were allowed to testify regarding their colleagues' corroborating opinions even though these corroborating opinions were not, in fact, relied on by the experts. The trial court determined that it was error to allow defendants' expert witnesses to testify regarding their colleagues' opinions when the expert's opinion was formed before, and not in reliance on, such consultation. Nevertheless, finding that this testimony was cumulative in light of other expert testimony that the X rays were normal, the court denied plaintiffs' motion.

The central issue raised on appeal is whether the trial court erred in allowing two of defendants' expert witnesses to testify that the opinions of other, nontestifying physicians corroborated their opinions. Both parties agree that this question must be answered according to the principles set out in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 196, 417 N.E.2d 1322, wherein the Illinois Supreme Court adopted Federal Rules of Evidence 703 and 705 (28 U.S.C.A. Rules 703, 705 (West 1984 & Supp. 1991)).

■ Federal Rule 703 allows an expert to give an opinion based on information reasonably relied upon by experts in the particular field, even if the information is not otherwise admissible in evidence. (28 U.S.C.A. Rule 703 (West Supp. 1991).) The Notes of the Advisory Committee on Proposed Rules contain the following pertinent remarks regarding Rule 703:

> "[T]he rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and

of considerable variety, including statements by patients and relatives, *reports and opinions from nurses, technicians and other doctors*, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." (Emphasis added.) (28 U.S.C.A. Rule 703, Notes of Advisory Committee on Proposed Rules, at 98 (West 1984).)

Rule 703 does not create an exception to the rule against hearsay because the underlying facts or data are admitted not for their truth, but for the limited purpose of explaining the basis of the expert's opinion. *City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 185, 554 N.E.2d 1381.

Rule 703 allows an expert to base his opinion on the opinions of others which are not in evidence so long as experts in the field ordinarily rely on such opinions in forming their own opinions. (See *Metro Utility v. Illinois Commerce Comm'n* (1990), 193 Ill. App. 3d 178, 186, 549 N.E.2d 1327.) For example, a psychiatric expert may rely on the reports of a patient's psychiatric history in arriving at his diagnosis. (*People v. Anderson* (1986), 113 Ill. 2d 1, 7-8, 495 N.E.2d 485.) In such circumstances, the opinion of the nontestifying expert would serve simply as a premise supporting the testifying expert's opinion on a broader issue. In the instant case, however, the opinions of the nontestifying experts do not serve as merely a narrow premise upon which the testifying experts' opinions are based. Instead, the nontestifying experts offered corroborating opinions on the *same issue* as that addressed by the testifying experts.

■ Accepting for the moment, *arguendo,* defendants' contention that their experts reasonably relied on their consultation with other experts in forming their opinions, we believe that neither *Wilson* nor Rule 703 allows an expert's testimony to simply parrot the corroborative opinions solicited from nontestifying colleagues. (*United States v. Grey Bear* (8th Cir. 1989), 883 F.2d 1382, 1392-93; but see *Lewis v. Rego Co.* (3d Cir. 1985), 757 F.2d 66, 73-74.) Testimony as to the basis of an expert's opinion need not be allowed if its probative value in explaining the expert's opinion is outweighed by the likely prejudicial impact or the tendency to confuse the jury. (*Anthony*, 136 Ill. 2d at 185, 554 N.E.2d at 1388-89.) The fact that a colleague agreed with the testifying expert's opinion is of dubious value in explaining the basis of the opinion. The party who is unable to cross-examine the cor-

roborative opinion of the expert's colleague, on the other hand, will likely be prejudiced. See *Emigh v. Consolidated Rail Corp.* (W.D. Pa. 1989), 710 F. Supp. 608, 611-13.

Moreover, we are not convinced that the expert's process of consultation with colleagues is the same as actual *reliance* on the corroborative opinions elicited during such consultation. If the expert's colleague merely corroborates the opinion independently arrived at by the expert, such corroboration might reinforce the expert's confidence in the opinion; the corroborative opinion, however, is not the *basis* of the expert's opinion. Even if a colleague's "second opinion" brings to light a factor which the expert overlooked (see *Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 483, 473 N.E.2d 1322), it would presumably be the overlooked factor, not the second opinion itself, upon which any change in the expert's opinion would be based. The fact that the expert considered the opinion of a colleague on the specific issue on which he is to testify in the case does not constitute the reasonable reliance required by *Wilson*, and allowing testimony of the out-of-court opinion would impermissibly circumvent the rule against hearsay. See *Denny v. Burpo* (1984), 124 Ill. App. 3d 73, 77-78, 463 N.E.2d 1074; Landsman, *Wilson v. Clark: Determining the Trustworthiness of an Expert's Underlying Data*, 79 Ill. Bar J. 290, 292 (1991).

The record in the instant case demonstrates that defendants' experts did not, in fact, "rely" on their colleagues' opinions in forming their own opinions. Dr. Schwartz stated, "I just passed it around to see if somebody else saw something that I didn't. But I had my opinion already." Dr. Buenger testified that he did not consult with his colleagues before arriving at his opinion, which was based on his own examination of Linda's X rays. It appears, then, that the consultation with other doctors only confirmed the experts' opinions; the opinions of the other doctors were not actually relied on by the experts in forming their opinions. Again, even if a colleague had pointed out factors not considered by the testifying expert, the record suggests that it would have been the overlooked factors, not the colleague's opinion, upon which the expert's opinion would have been based.

■■ Defendants argue that, even if it was improper to allow the corroborative testimony, the trial court correctly determined that such evidence was merely cumulative and does not require reversal. Where evidence is erroneously admitted, reversal is required unless the record affirmatively shows that the error was not prejudicial. (*Freeding-Skokie Roll-Off Service, Inc. v. Hamilton* (1985), 108 Ill. 2d 217, 223, 483 N.E.2d 524.) The admission of improper evidence is harmless

where there is other evidence to support the verdict. *Raines v. New York Central R.R. Co.* (1972), 51 Ill. 2d 428, 437, 283 N.E.2d 230.

■ Here, we cannot characterize the improperly admitted evidence as merely cumulative. It is true that defendants' two retained experts provided their own opinions on the point at issue. Because the erroneous admission of corroborative opinions will *always* be cumulative to the opinion evidence presented by the testifying expert, however, viewing the improper corroborative testimony as "merely" cumulative would render meaningless the prohibition against such testimony. Defendants further note that four other physicians testified that Dr. Nazarian did not violate the standard of care. Of these four, however, two were officers of defendant Lake County Radiology who gave their opinion only after the initiation of litigation, and one was Dr. Nazarian himself. The fourth, Dr. Creath, barely addressed the question of Dr. Nazarian's breach of the standard of care.

Moreover, defendants' attorney highlighted the corroborative testimony in his opening statement, and he also emphasized in his closing argument that more experts agreed with defendants' position than with plaintiffs'. Finally, we note that the question of whether Linda's 1982 X rays revealed an abnormality was in reality the *only* issue in this case, and the testimony of the experts on both sides was central to the resolution of this issue.

We conclude that the record does not affirmatively demonstrate that the improperly admitted testimony was not prejudicial to plaintiffs, so the error is not harmless. Accordingly, plaintiffs are entitled to a new trial.

The judgment of the circuit court of Lake County is reversed, and the cause is remanded.

Reversed and remanded.

UNVERZAGT and WOODWARD, JJ., concur.