BRITTANY LYNN WINGO, a Minor, by Harold G. Wingo, Jr., *et al.*, her Parents and Next Friends, *et al.*, Plaintiffs-Appellees, v. ROCKFORD MEMORIAL HOSPITAL, Defendant-Appellant (Rockford Clinic, Ltd., *et al.*, Defendants).

Second District    No. 2—96—1268

Opinion filed October 17, 1997.

Kenneth W. Traum and Erik K. Jacobs, both of Kostantacos, Traum, Reuterfors & McWilliams, P.C., of Rockford, for appellant.

Patrick A. Salvi and J. Matthew Dudley, both of Salvi & Schostok, P.C., of Waukegan, and Robert G. Black, of Naperville, for appellees.

JUSTICE THOMAS delivered the opinion of the court:

The plaintiffs, Harold G. Wingo and Donnica Wingo, filed this

medical malpractice action against defendant Rockford Memorial Hospital (Hospital) and defendant Edward W. Klink, M.D., to recover for damages (severe brain damage) allegedly suffered by their baby, Brittany Lynn Wingo, as a result of the defendants' negligence in failing adequately to treat and in releasing the mother from the Hospital at a time when she was leaking amniotic fluid prior to Brittany's birth. Following closing arguments in the case but prior to the jury's verdict, the plaintiffs and Dr. Klink entered into a settlement agreement. Pursuant to the terms of that agreement, Dr. Klink agreed to pay the plaintiffs $1 million if the Hospital was found negligent and $3 million if the Hospital was not found negligent. Following its deliberations, the jury returned a verdict against the defendants for $10,232,523, and the trial court subsequently entered judgment in accordance with the verdict. The Hospital appeals.

## FACTS

The record shows that Donnica came to the Hospital at 5 a.m. on January 11, 1991, reporting that her bag of waters had broken. She was 35 to 36 weeks pregnant. Jayne Foster, a nurse at the Hospital, charted that a large amount of clear amniotic fluid was leaking from the patient. Donnica was also experiencing some uterine contractions. Thomas Iannucci, M.D., examined the patient and also noted that she was leaking amniotic fluid. After two tests came back positive for a ruptured bag of waters, Dr. Iannucci diagnosed Donnica as having ruptured membranes and admitted her to the Hospital with orders that she be monitored for the possible onset of infection.

Later that morning Dr. Klink and nurse Carol Welden took over the care of the patient. Around 9:30 a.m., Dr. Klink examined Donnica and charted that he found no amniotic fluid at that time. Up to that exam, the chart indicated that the patient had continued leaking fluid for the previous five hours. Because he did not observe any fluid during his examination, Dr. Klink began to suspect that the patient did not have a ruptured bag of waters or that a rupture had sealed over. Welden was aware of Klink's suspicions.

The hospital charts revealed that after Dr. Klink's examination Welden continued to observe Donnica leak clear fluid at least intermittently up to her last recorded observation at 2 p.m. At 2:45 p.m., Dr. Klink spoke with Welden on the telephone about Donnica's condition. It is undisputed that neither Dr. Klink nor Welden could recall the specifics of that conversation. After this phone conversation, Donnica was discharged from the Hospital. About 11 p.m. that same day, Donnica telephoned Dr. Klink's answering service and then spoke with Dr. Klink at 11:30 p.m., complaining of cramping, chills, and diarrhea. Dr. Klink told Donnica to remain at home.

Around 3 a.m. on January 12, 1991, Donnica awoke in active labor and returned to the Hospital. Fetal heart rates showed that the baby was severely distressed and in need of immediate delivery. The baby, Brittany, was delivered at 3:52 a.m. in a limp, nonresponsive, and profoundly depressed condition. Tests later showed that the child was diagnosed with a staph aureus sepsis and severe perinatal asphyxia or ischemia. Staph aureus is a specific type of bacteria that can cause infection in a newborn infant. The same bacteria was found in the cervix of the mother. It was later determined that Brittany was born with severe brain damage.

Welden testified in her deposition that, based on her usual and customary practice, she likely would have told Dr. Klink during their 2:45 p.m. telephone conversation that "there has been no change since you were here last." She further acknowledged that this would have been the extent of the detail given to the doctor. At trial, she testified that she would not have simply told the doctor that there had been no change. She testified that she would have summarized the condition of the patient throughout the day and would have told the doctor that the patient leaked amniotic fluid if she continued to do so. Welden further testified at trial that, if she had only told the doctor during that conversation that there had been no change, it would have been a breach of the standard of care. She also acknowledged that, if she failed to tell the doctor about the leaking fluid even if he did not ask, it would have been a breach of the standard of care.

Dr. Klink testified that, if the patient leaked fluid after his examination, it would tend to confirm a ruptured bag, not that a leak had sealed over. A patient with a ruptured bag should not be released from the hospital. He further testified that he must not have been told about the leakage during the 2:45 p.m. conversation with Welden, since he would never have released a patient who had leaked fluid after his earlier examination. If Welden had informed him of the leakage, he would have ordered that the patient remain in the hospital for continued monitoring. He further noted that, if Welden had told him there had been no change, he would have taken this to mean the patient had not leaked fluid from the time he was there last at 10 a.m. until 2:45 p.m. Furthermore, if Welden had questioned his discharge order on the basis of continued leaking, he would not have released Donnica.

Caryl Miller, the director of women's services and the head obstetrical nurse at the Hospital, testified that she reviewed the depositions in the case, including the deposition of Jayne Foster, to understand what happened in the case. She noted that she did not rely on the depositions in formulating her opinions in the case, but

acknowledged that she had stated in her deposition that she had relied upon the depositions in finally arriving at her opinions, even if they only served to better inform her as to what likely happened in the case. Miller noted that Foster was critical of Welden in her deposition stating that she felt that Welden deviated from the standard of care in allowing Donnica to be discharged while leaking amniotic fluid. According to Miller, Foster indicated in her deposition that she felt that Welden departed from the standard of care in not questioning Dr. Klink's discharge order and in not utilizing the administrative chain of command to prevent the discharge. Counsel for the Hospital objected on hearsay grounds to Miller's testimony about what Foster said in her deposition. The trial court overruled the objection.

Miller further testified that the standard of care required Welden to tell Dr. Klink that Donnica had leaked amniotic fluid after the 10 a.m. examination whether Dr. Klink asked or not. Based on her review of the depositions taken in the case, Miller noted that all Welden told Dr. Klink was that there had been no change since the doctor was "here last" and Dr. Klink interpreted that to mean that the patient had not leaked fluid since he last saw her.

Sarah Craig, a registered nurse and perinatal clinician in charge of the obstetrical department at the Hospital, testified as an adverse witness called by the plaintiffs that when a patient is admitted with a ruptured bag of waters one of the most important observations a nurse must make is whether the patient continues to leak amniotic fluid. Given the continued leaking and Dr. Klink's view of the situation following his examination, Craig opined that the standard of care required Welden affirmatively to tell Dr. Klink during the 2:45 p.m. conversation that the patient had continued leaking clear fluid. If Welden did not tell Klink, whether he asked or not, that the patient experienced further leaking following the doctor's examination, Welden deviated from the applicable standard of care. If Welden stated only that there had been "no change" as she stated in her deposition, Craig expected Welden to know that the doctor may consider that the nurse was referring to the patient's condition at the time the doctor was last there, not to what happened subsequently. Craig also opined that Welden had a sufficient basis to question Dr. Klink's discharge order and to go up the administrative chain of command to prevent the discharge. If she had, Craig opined, Welden would have conformed with the standard of care.

During the Hospital's case in chief, Craig testified that if Welden only said "there had been no change since you were here last this morning" that would have been an accurate way to report the situa-

tion. Craig then stated that Welden did not deviate from the standard of care either in her communication with the doctor at 2:45 p.m. or in her failure to use the administrative chain of command to question the discharge order.

Mary Mather, a nurse at the Hospital, testified that if during the 2:45 p.m. conversation with Dr. Klink Welden stated only that there had been "no change" in the patient, that would have been an appropriate and correct way to report the circumstances to Dr. Klink. Mather opined that Welden's treatment of the patient fell within the applicable standard of care.

Robert C. Vannucci, M.D., a specialist in child neurology and pediatrics, testified that in his opinion Brittany's brain damage was caused by septic shock just prior to delivery, during which there was severe ischemia or lack of blood flow to the brain. Dr. Vannucci noted that Donnica had a ruptured bag of waters on January 11, 1991, at 5 a.m. A ruptured membrane allows direct exposure of the fetus to outside bacteria. In his opinion, based on cultures taken from the child and mother, bacteria from the mother's cervix migrated into the fetus. Within hours of the rupture, bacteria was already entering Brittany's body. If left uncorrected, the situation would result in reduced blood flow to the brain, causing ischemia and brain damage. Vannucci opined that Donnica's discharge from the Hospital was the cause of Brittany's brain damage. Since the baby was delivered at 3:52 a.m., the brain damage did not exist a full four hours before delivery.

Martin Gimovsky, M.D., a board-certified obstetrician and gynecologist, testified that he teaches nurses in programs focusing on the assessment of a fetus during labor, interpretation of fetal monitoring, management of labor and delivery, and its complications. He also routinely lectures obstetrical nurses in continuing education courses, which include the subject of prematurely ruptured membranes. Dr. Gimovsky opined that Dr. Klink deviated from the standard of care in discharging Donnica on the afternoon of January 11, 1991, and in failing to admit her after the 11:30 p.m. phone conversation that night. He noted that Dr. Klink failed to perform tests that a reasonably competent obstetrician would perform to determine whether or not Donnica had a leak that sealed over.

Dr. Gimovsky further testified that Welden deviated from the standard of care in not appropriately informing Dr. Klink that the patient continued to leak fluid. He stated that Welden had a responsibility to make sure Klink understood that the patient continued to leak fluid. He also opined that Welden deviated in failing to question the doctor's discharge order or utilize the administra-

tive command to prevent the patient's discharge. In his opinion, if Welden had not deviated from the standard of care, the mother would not have been discharged, she would have been appropriately monitored, and the baby would have been delivered before the onset of brain damage.

William Mayer, M.D., testified that, if Welden had told Dr. Klink that "nothing had changed since you were here last," a reasonably well-qualified obstetrician would take that to mean that nothing had changed since Dr. Klink had been there last, not since a prior examination by another physician. In this case, it would mean that the patient had not leaked any further fluid. Dr. Mayer stated that, in order to conform to the standard of care of a reasonably well-qualified obstetrical nurse, Welden had to communicate to Dr. Klink the important things that had taken place since he left, including that the patient intermittently leaked amniotic fluid following Dr. Klink's examination. Furthermore, even if Dr. Klink was aware of the leakage but still discharged the patient, Welden deviated from the applicable standard of care by not using the administrative chain of command to prevent the discharge.

## EXPERT PHYSICIAN TESTIMONY TO ESTABLISH THE STANDARD OF CARE

■ On appeal, the Hospital first argues that the trial court erred in allowing the plaintiffs to present expert testimony from three doctors to establish the applicable standard of care for the Hospital's nurse. Citing *Dolan v. Galluzzo*, 77 Ill. 2d 279 (1979), the Hospital argues that the expert testifying as to the standard of care must be licensed in the "same school of medicine" as the healthcare practitioner whose conduct is being tested.

Initially, we note that the defendant waived the issue by failing to make a contemporaneous objection at trial even though it previously raised it in a motion *in limine*. See *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502 (1994) (denial of motion *in limine* in a civil case does not preserve the issue for appeal if there is no contemporaneous objection at least the first time the evidence is offered at trial). However, we further find that the Hospital's claim should be rejected on the merits. We find *Dolan* inapplicable under the factual scenario presented here.

■ In *Dolan*, the supreme court held that an orthopedic surgeon could not be permitted to testify as to the standard of care applicable to a podiatrist. *Dolan*, 77 Ill. 2d at 285. The court noted that the legislature had provided distinct licensing and regulatory requirements for various schools of medicine. *Dolan*, 77 Ill. 2d at 284. The court further stated as follows:

"We simply are not disposed to provide for what, in effect, may result in a higher standard of care when the legislature, by recognizing various schools of medicine, has not done so. To do so would not only be unfair to podiatrists (*i.e.*, to allow practitioners of other schools to testify regarding the standard of care podiatrists owe), but it would also assume that science and medicine have achieved a universal standard of treatment of disease or injury. Such is not the case." *Dolan*, 77 Ill. 2d at 284.

The court therefore reached the conclusion in *Dolan* that "in order to testify as an expert on the standard of care in a given school of medicine, the witness must be licensed therein." *Dolan*, 77 Ill. 2d at 285.

The rule announced in *Dolan* was subsequently followed in a number of Illinois cases. See, *e.g.*, *Novey v. Kishwaukee Community Health Services Center*, 176 Ill. App. 3d 674 (1988) (occupational therapist cannot testify as to the standard of care applicable to a physical therapist); *Baumgartner v. First Church of Christ, Scientist*, 141 Ill. App. 3d 898 (1986) (Christian Science practitioners could not be held to owe same duty of care to patient as is imposed on medical profession).

In *Jones v. O'Young*, 154 Ill. 2d 39 (1992), the supreme court held that the plaintiffs' infectious disease specialist did not have to be a specialist in the same area of medicine as the defendant plastic surgeon, orthopedic surgeon, and general surgeon in order to testify against the defendant physicians as to the applicable standard of care in their treatment of the plaintiff's infectious disease. In so doing, the court stated the requirements necessary to demonstrate an expert physician's qualifications and competency to testify. First, the physician must be a licensed member of the school of medicine about which he proposes to testify. *Jones*, 154 Ill. 2d at 43. Second, the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community. *Jones*, 154 Ill. 2d at 43, citing *Purtill v. Hess*, 111 Ill. 2d 229, 243 (1986). The court then stated:

"[These] foundational requirements provide the trial court with the information necessary to determine whether an expert has expertise in dealing with the plaintiff's medical problem and treatment. Whether the expert is qualified to testify is not dependent on whether he is a member of the same specialty or subspecialty as the defendant but, rather, whether the allegations of negligence concern matters within his knowledge and observation." *Jones*, 154 Ill. 2d at 43.

■ We note that no Illinois case has directly applied *Dolan* to

prevent a physician from establishing the applicable nursing standard of care, although it is clear that in several cases doctors have testified against nurses to establish the nursing standard of care without it being challenged (see *Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150, 162 (1995) (doctor testified that nurses failed to conform to nursing standard of care where nurses failed to notify doctor of patient's condition); *Glassman v. St. Joseph Hospital*, 259 Ill. App. 3d 730, 738 (1994) (doctor testified that nurses violated standard of care by failing to notify doctors of patient's seizure); *First National Bank v. Porter*, 114 Ill. App. 3d 1, 8 (1983) (doctor testified that nurse deviated from standard of care in her examination of patient in delivery)). Additionally, we note that, from our review of the out-of-state authority, we are unaware of any state that has ever found it reversible error for a physician to testify as to the applicable nursing standard of care. See, *e.g., Paris v. Kreitz*, 75 N.C. App. 365, 380, 331 S.E.2d 234, 245 (1985); *Goff v. Doctors General Hospital*, 166 Cal. App. 2d 314, 316, 333 P.2d 29, 31 (1958).

We find that the facts of the instant case do not fit within the license requirement of *Dolan* or *Jones*. Those cases indicate that the reason for the rule is to prevent a higher standard of care being imposed upon the defendant and to ensure that the testifying expert has expertise in dealing with the patient's medical problem and treatment and that the allegations of negligence are within the expert's knowledge and observation. Those concerns have not been sacrificed here. In the instant case, the allegations of negligence against nurse Welden did not concern a nursing procedure but, rather, related to what a nurse is required to communicate to a physician about what transpired since the physician last saw the patient. As such the allegations of negligence do not concern an area of medicine about which there would be a different standard between physician and another school of medicine. Furthermore, it was established that the allegations of negligence were well within the testifying doctors' knowledge and experience. We believe that a physician should be entitled to testify about what he or she is entitled to rely upon in the area of communication from a nurse in the context of an obstetrical team rendering care to a patient in a hospital. Accordingly, we hold that no error occurred in allowing the doctors to testify as to the applicable nursing standard of care in this case.

■ Additionally, we find that even if it was error to admit the physicians' testimony under *Dolan* it was harmless under the circumstances presented here. Three nurses testified that the nursing standard of care required Welden affirmatively to tell Dr. Klink that the patient continued to leak amniotic fluid. One nurse testified dur-

ing the Hospital's case in chief that, if Welden had questioned the discharge order or utilized the administrative chain of command, she would have complied with the applicable standard of care. The head obstetrical nurse testified that another nurse at the Hospital had testified in her deposition that Welden deviated from the standard of care in not questioning the discharge order and in not utilizing the administrative chain of command to prevent the discharge. Thus, even without the physicians' testimony there was evidence in the record to establish the standard of care for nurses, and we do not find it likely that the outcome was affected by allowing the testimony.

## CONTINUANCE

The Hospital argues that if *Dolan* is not applied to bar the physicians' testimony then the trial court erred in not granting the Hospital a continuance to obtain expert physician testimony. We disagree.

■ It is well settled that a litigant does not have an absolute right to a continuance and that the decision to grant or deny a continuance is within the sound discretion of the trial court. *Rutzen v. Pertile*, 172 Ill. App. 3d 968, 974 (1988). In the instant case, the plaintiffs' experts were timely disclosed as experts, and the Hospital was aware of their opinions long before trial. The Hospital had ample time to attempt to obtain contrary opinions. We find no abuse of discretion in the trial court's denial of a continuance.

## SEVERANCE

Next, the Hospital argues that, if *Dolan* is held inapplicable here, the trial court erred in not severing the trial in the instant case. It claims that the interests of the codefendants were so diametrically opposed that the Hospital could not get a fair trial.

■ Section 2—1006 of the Code of Civil Procedure (735 ILCS 5/2—1006 (West 1996)) provides that an action may be severed whenever it can be done without prejudice to a substantial right. The trial court has broad discretion in determining whether to grant a severance (*Pickering v. Owens-Corning Fiberglas Corp.*, 265 Ill. App. 3d 806, 811 (1994)), and the trial court's decision in that regard will not be overturned absent an abuse of discretion (*Walter v. Carriage House Hotels, Ltd.*, 239 Ill. App. 3d 710, 725 (1993)). A trial court's discretion is to be exercised in each case by an appraisal of administrative convenience and the possibility of prejudice to substantial rights of the litigants in the light of the particular problems that will arise in the course of trial. *Mount v. Dusing*, 414 Ill. 361, 367 (1953).

■ Applying the above-mentioned principles, we find no abuse of discretion in the trial court's denial of a severance. Although there

would unquestionably be some benefit to the Hospital to sever the plaintiffs' case, the trial court's refusal to do so did not amount to an abuse of discretion given the administrative inconvenience and the prejudice to the plaintiffs in trying the issues twice separately.

## HEARSAY TESTIMONY

The Hospital next argues that the trial court improperly allowed the hearsay opinion testimony from Foster's deposition to be introduced through Miller's trial testimony. The plaintiffs contend that the testimony was admissible under *Wilson v. Clark*, 84 Ill. 2d 186, 196 (1981), wherein the Illinois Supreme Court adopted Federal Rules of Evidence 703 and 705 (28 U.S.C.A. Rules 703, 705 (West 1996)).

■ Federal Rule 703 allows an expert to give an opinion based on information reasonably relied upon by experts in the particular field, even if the information is not otherwise admissible in evidence. *Kim v. Nazarian*, 216 Ill. App. 3d 818, 826 (1991). Rule 703 does not create an exception to the rule against hearsay because the underlying facts or data are admitted not for their truth, but for the limited purpose of explaining the basis of the expert's opinion. *City of Chicago v. Anthony*, 136 Ill. 2d 169, 185 (1990). Rule 703 allows an expert to base his opinion on the opinions of others which are not in evidence so long as experts in the field ordinarily rely on such opinions in forming their own opinions. *Kim*, 216 Ill. App. 3d at 827.

■ The Hospital claims that Miller did not rely on Foster's deposition in forming her opinions. Citing *Kim*, the Hospital argues that neither Rule 703 nor *Wilson* allows the complained-of testimony.

In *Kim*, the court held that two of the defendant's expert witnesses were erroneously allowed to testify that the opinions of other, nontestifying physicians corroborated their opinions. In *Kim*, the testifying experts testified that they did not actually rely on their colleagues' opinions before forming their own opinions.

The present case is distinguishable from *Kim*. Here, Miller specifically testified that she reviewed Foster's deposition to give her an understanding of the case and that she relied on that deposition in arriving at her opinion at least in that sense. The opinion of Foster was not introduced to corroborate Miller's opinion. Moreover, Miller was the Hospital's expert and thus the plaintiff could properly elicit testimony as to the basis of that opinion, including whether Foster's opinion had any effect on Miller's own opinion and whether Miller was aware of Foster's criticisms.

## ROUTINE PRACTICE TESTIMONY

■ The Hospital next argues that the trial court improperly al-

lowed Dr. Mayer and Dr. Klink to testify about Dr. Klink's state of mind with respect to Klink's conversation with Welden, the substance of which Klink could not recall.

The Hospital waived the issue by failing to object contemporaneously when the evidence was admitted at trial. See *Illinois State Toll Highway Authority*, 163 Ill. 2d at 502. The Hospital contends that the plaintiffs did not lay a proper foundation prior to the admission of the evidence. However, if the Hospital objected to evidence on this basis, it should have done so contemporaneously at trial. If the Hospital had made a timely objection, the plaintiffs would have been afforded an opportunity to lay a proper foundation. At any rate, we find that the evidence was proper as routine practice and custom testimony. See *Brennan v. Wisconsin Central Ltd.*, 227 Ill. App. 3d 1070, 1085 (1992) (evidence of routine practice may be established by opinion testimony of a person with personal knowledge or by the introduction of specific instances of conduct sufficient in number to support a finding of routine practice).

## MIGHT OR COULD TESTIMONY

The Hospital next argues that the trial court improperly allowed "might or could" testimony to establish the plaintiffs' burden of proof instead of the "more probably true than not true" standard. In support of its position, the Hospital cites *Netto v. Goldenberg*, 266 Ill. App. 3d 174, 180 (1994), where the court held that to prove proximate cause a plaintiff must show "that it is more probably true than not that the defendant's negligence was one of the proximate causes of the plaintiff's injury."

First, we again note that the Hospital waived the argument by failing to make a contemporaneous objection at trial. See *Illinois State Toll Highway Authority*, 163 Ill. 2d at 502. Even if we found that the issue was not waived, we would find the Hospital's argument to be without merit. First, we note that the Hospital does not point to any specific place in the record where the plaintiffs elicited "might or could" testimony in relation to proximate cause or causation. Moreover, we note that the Hospital cites no case law for the proposition that every question posed to an expert in a negligence case must be asked in terms of "more probably true than not true" and *Netto* has no application here.

## ANNUITY TESTIMONY

The Hospital next argues that the trial court improperly barred the expert "annuitist" testimony of Stan Galler.

Galler, an insurance broker, was disclosed as an expert witness by the Hospital to offer opinion testimony regarding the present

value of Brittany's future medical needs. Galler testified that he would take the figures developed by Arthur Dobblaere, the plaintiffs' economic expert, and Dr. Robert Eilers, the plaintiffs' life expectancy expert, and then submit these figures to an insurance company, which would provide him with a figure for the cost of an annuity from that insurance company to meet Brittany's medical expenses.

The plaintiffs argue that the trial court properly barred Galler's testimony as to the cost of the annuity, citing *Singh v. Air Illinois, Inc.*, 165 Ill. App. 3d 923 (1988), and *Lorenz v. Air Illinois, Inc.*, 168 Ill. App. 3d 1060 (1988). In *Singh*, the court held that the testimony of an insurance broker as to the cost of an annuity was barred. The court stated:

> "While we recognize that our supreme court has sanctioned the use of annuity tables in determining present case value (*Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill. 2d 164, 133 N.E.2d 288, *cert. denied* (1956), 352 U.S. 833, 1 L. Ed. 2d 53, 77 S. Ct. 49), the validity of such evidence does not signify that the cost of a particular annuity is likewise admissible, or that it is representative of the present value of lost earnings. On the contrary, the *Allendorf* court cautioned that expert testimony should be used only with neutral figures to describe to the jury a mathematical process which would simplify the jury's task of determining present value. In fact, other courts have noted the misleading nature of placing before the jury the cost of an annuity contract as opposed to neutral figures. [Citations.] Moreover, as an insurance broker relying on final quotations from outside sources, [the broker] could not be effectively cross-examined as to the basis and legitimacy of his testimony." *Singh*, 165 Ill. App. 3d at 930-31.

The Hospital claims that the Appellate Court, First District, later retreated from its position in *Singh* by stating in *Varilek v. Mitchell Engineering Co.*, 200 Ill. App. 3d 649 (1990), that "[i]n our view, the supreme court's holding in *Merchants* nullifies the requirement in *Allendorf* that an actuary use neutral figures only in making damage calculations." See *Varilek*, 200 Ill. App. 3d at 673. We find the Hospital's argument in this regard unpersuasive. In *Varilek*, the issue was whether an expert in testifying to present cash value of lost earnings and future medical expenses could testify based on actual or specific numbers tailored to the alleged lost earnings and medical expenses. The case did not involve a broker relying on outside sources to attest to the cost of a particular annuity. Accordingly, we find that the trial court did not err in following *Singh* and barring the testimony.

## GOOD FAITH OF SETTLEMENT

Next, the Hospital argues that the trial court erred in refusing to

allow it to conduct discovery with respect to the timing, terms, and conditions of the plaintiffs' settlement with Dr. Klink. In that regard, the record shows that the plaintiffs reached a settlement with Dr. Klink after closing argument but before the jury finished deliberating. The conditions of the settlement were that Dr. Klink would pay the plaintiffs $1 million if the Hospital was found negligent and $3 million if the Hospital was not found negligent. The Hospital maintains that this was an end run around the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/0.01 *et seq.* (West 1996)). It argues that the plaintiffs put on a weak attack of Dr. Klink's negligence because they knew they would settle with Dr. Klink and that in return Klink would put the blame on the Hospital and, if the Hospital was found negligent, Klink only had to pay $1 million instead of $3 million. In essence, the Hospital argues that this allows Dr. Klink to reduce his damages by $2 million at the expense of the Hospital. It further argues that Klink and the plaintiffs manipulated the settlement to deprive the Hospital of its right to a setoff. The Hospital claims that the settlement in the present case was similar to forbidden loan-receipt agreements (see *In re Guardianship of Babb*, 162 Ill. 2d 153 (1994)) and "Mary Carter agreements" (see *Banovz v. Rantanen*, 271 Ill. App. 3d 910 (1995)). Further, it argues it should have been allowed discovery to delve into the issue because the facts might indicate that Dr. Klink and the plaintiffs had already reached an agreement before closing argument but did not inform the Hospital or the court.

▮ In *In re Guardianship of Babb*, the supreme court described a typical loan-receipt agreement as follows:

"[T]he plaintiff receive[s] an interest-free loan (settlement monies) from the settling tortfeasor, who [is] then dismissed from the plaintiff's tort action. Under the terms of the loan-receipt agreement, however, the plaintiff [is] obligated to repay the settlement monies received pursuant to the loan-receipt agreement to the settling tortfeasor out of any judgment or settlement that the plaintiff obtain[s] from the other nonsettling tortfeasors." *In re Guardianship of Babb*, 162 Ill. 2d at 168.

The supreme court found it important that such loan receipts violate the terms of the Contribution Act because they attempt to deprive the nonsettling tortfeasors of their statutory right to a setoff. *In re Guardianship of Babb*, 162 Ill. 2d at 168. The court further noted that by providing for setoff rights, section 2 of the Contribution Act (740 ILCS 100/2 (West 1996)) also reflects Illinois' public policy of protecting the financial interests of nonsettling tortfeasors.

A Mary Carter agreement has the following features: (1) the li-

ability of the settling defendant is limited and the plaintiff is guaranteed a minimum recovery; (2) the settling defendant remains a party to the pending action without disclosing the full agreement to the nonsettling defendant and/or the judge and jury; and (3) if judgment against the nonsettling defendant is for more than the amount of settlement, any money collected will first offset the settlement so that the settling defendant may ultimately pay nothing. *Banovz*, 271 Ill. App. 3d at 913-14. The problem with these types of agreements is that it gives the settling defendant a financial stake in the outcome, and when this financial interest is kept secret from the jury it distorts the adversarial process. *Banovz*, 271 Ill. App. 3d at 914.

Here, we find that the instant settlement agreement was not similar to the agreements forbidden in *Babb* and *Banovz*. First, unlike a loan-receipt agreement, the settlement agreement here did not require the plaintiffs to repay any sums to Dr. Klink. The agreement at issue was more like a high-low settlement agreement which is routinely allowed. See *McDermott v. Metropolitan Sanitary District*, 240 Ill. App. 3d 1, 45 (1992). Moreover, the policy concerns of the Contribution Act which were of such concern in the *Babb* case are not a factor here. None of the defendants in this case filed a contribution action while the original action was pending. Thus, the Hospital would not be entitled to contribution from the settling defendant, Dr. Klink. See *Laue v. Leifheit*, 105 Ill. 2d 191, 196 (1984).

We also find that the settlement agreement here did not amount to a Mary Carter agreement. First, there was no danger that the settling defendant would ultimately pay nothing as in the case of a Mary Carter agreement. Under the instant agreement, Dr. Klink was required to pay at least $1 million regardless of the outcome. Second, the record indicates that there was no agreement in this case until after closing arguments so the adversarial process was not distorted by the settling defendant's having a stake in the outcome.

We also find without merit the Hospital's contention that it should be entitled to conduct discovery into the timing of the settlement. In that regard, we note that the trial court conducted an extensive hearing on the issue and heard the arguments of counsel. The attorneys for the plaintiffs and Dr. Klink represented to the trial court, as officers of the court, that they had not entered into a settlement prior to the conclusion of closing argument. They explained that the decision to settle was dictated by the strength of Dr. Klink's case versus the weakness of the Hospital's case, and the fact that the attorney for the Hospital had represented that he would appeal the case in the event of a verdict against the Hospital so the plaintiffs

wanted to be assured of some compensation in the short term. The trial court was convinced that no impropriety occurred in relation to the settlement stating that Dr. Klink put on a fine defense and that he believed the representations of counsel that an agreement was not reached prior to closing. The trial court concluded by stating:

> "[Counsel] made their representations to the court. That's the extent of discovery that I think is necessary. There was no agreement. There was no collusion. So that motion is denied."

A trial court is afforded great latitude in ruling on discovery matters, and a reviewing court will not disturb its ruling absent a manifest abuse of discretion. *Evers v. Edward Hospital Ass'n*, 247 Ill. App. 3d 717, 735 (1993). We find no abuse of discretion in the trial court's ruling.

## PLAINTIFFS' MOTIONS *IN LIMINE* AND FOR SUMMARY JUDGMENT

Lastly, the Hospital contends that it was denied a right to a fair trial because of the trial court's favorable rulings on the plaintiffs' motions *in limine* and for summary judgment. The Hospital notes that an expert testified that fetal brain damage is unknown 35% of the time and that there are multiple factors that can lead to brain damage, such as tobacco use by the mother. It therefore argues that the trial court erred in barring testimony about the mother's cigarette smoking. It also complains that the court erroneously ruled in connection with the plaintiffs' motion for summary judgment that the discharge was *a* proximate cause of the brain damage and the failure to readmit was a supervening cause. It further contends that the plaintiffs' counsel improperly argued to the jury that the court had ruled that discharge was *the* cause of brain damage.

The decision of whether to grant a motion *in limine* rests within the sound discretion of the trial court. *Rush v. Hamdy*, 255 Ill. App. 3d 352, 365 (1993). In ruling on a motion *in limine*, the court should balance the prejudice that might be avoided if it grants the motion against the complication or inconvenience that would result if the motion is denied. *Rush*, 255 Ill. App. 3d at 365. Summary judgment is proper when the pleadings, depositions, and admissions on file, together with the affidavits, if any, demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1996).

Proper expert testimony in a medical malpractice action goes to issues of the deviation from the standard of care and causation with a reasonable degree of medical certainty. In the instant case, the other possible causes of brain damage suggested by the Hospital

were never linked to Brittany. The only opinion testimony established with a reasonable degree of medical certainty indicated that the brain damage was the result of sepsis, and the evidence was unequivocal that absent the discharge from the Hospital the infection would have been dealt with before the onset of sepsis causing brain damage. No expert in the case intimated that the cause of Brittany's brain damage was the result of anything other than the treatment or lack of treatment she and her mother received at the Hospital. Under the circumstances, we find no error with respect to the trial court's rulings or with respect to the plaintiffs' counsel's argument.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

DOYLE and RATHJE, JJ., concur.